# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| **GLYNIS KATE MONTOYA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **1:20CV1157** |
| | ) | |
| **KILOLO KIJAKAZI,** | ) | |
| **Acting Commissioner of Social** | ) | |
| **Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

Plaintiff Glynis Kate Montoya brought this action to obtain review of a final decision of the Commissioner of Social Security[1] denying her claim for supplemental security income ("SSI"). The Court has before it the administrative record and cross-motions for judgment.

## I. PROCEDURAL HISTORY

In 2018, Plaintiff filed an application for SSI alleging a disability onset date of January 1, 2016. (Tr. 15, 179-184.)[2] The application was denied initially and again upon reconsideration. (Tr. 15, 137-40, 147-156.) After an administrative hearing, the ALJ determined on May 21, 2020 that Plaintiff was not disabled under the Act. (Tr. 15-70.) On October 23, 2020, the Appeals Council denied Plaintiff's request for review making the ALJ's decision the final decision for purposes of review. (Tr. 1-6.)

---

[1] The President appointed Kilolo Kijakazi as the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Kilolo Kijakazi should be substituted for Andrew M. Saul as Defendant in this suit.

[2] Transcript citations refer to the Administrative Transcript of Record filed manually with the Commissioner's Answer. (Docket Entry 8.)

## II. STANDARD FOR REVIEW

The scope of judicial review of the Commissioner's final decision is specific and narrow. *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986). Review is limited to determining if there is substantial evidence in the record to support the Commissioner's decision. 42 U.S.C. § 405(g); *Hunter v. Sullivan*, 993 F.2d 31, 34 (4th Cir. 1992); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In reviewing for substantial evidence, the Court does not re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996). The issue before the Court is not whether Plaintiff is disabled but whether the finding that she is not disabled is supported by substantial evidence and based upon a correct application of the relevant law. *Id.*

## III. THE ALJ'S DECISION

The ALJ followed the well-established sequential analysis to ascertain whether the claimant is disabled, which is set forth in 20 C.F.R. § 416.920.[3] *See Albright v. Comm'r of Soc. Sec. Admin.*, 174 F.3d 473, 475 n.2 (4th Cir. 1999). At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since July 31, 2018, the application date. (Tr.

---

[3] "The Commissioner uses a five-step process to evaluate disability claims." *Hancock v. Astrue*, 667 F.3d 470, 472-73 (4th Cir. 2012) (citing 20 C.F.R. § 416.920(a)(4)). "Under this process, the Commissioner asks, in sequence, whether the claimant: (1) worked during the alleged period of disability; (2) had a severe impairment; (3) had an impairment that met or equaled the requirements of a listed impairment; (4) could return to her [or his] past relevant work; and (5) if not, could perform any other work in the national economy." *Id.* A finding adverse to the claimant at any of several points in this five-step sequence forecloses a disability designation and ends the inquiry. *Id.* at 473. "Through the fourth step, the burden of production and proof is on the claimant. If the claimant reaches step five, the burden shifts to the Secretary to produce evidence that other jobs exist in the national economy that the claimant can perform considering his age, education, and work experience." *Hunter*, 993 F.2d at 35 (internal citations omitted).

2

17.) The ALJ next found the following severe impairments at step two: depression, anxiety, post-traumatic stress disorder, autism spectrum disorder, degenerative disc disease, and obesity. (*Id.*) At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments listed in, or medically equal to one listed in, Appendix 1. (*Id.*)

The ALJ next set forth Plaintiff's Residual Functional Capacity ("RFC") and determined that she could perform light work, with the following additional limitations:

> occasionally balance, stoop, kneel, crouch, crawl, or climb ramps or stairs and never climb ladders, ropes, or scaffolds; she must avoid concentrated exposure to unprotected heights, moving machinery, and hazardous machinery; the individual can understand, remember, and carry out instructions that are consistent with a reasoning level of "two" or "three" as defined in the Dictionary of Occupational Titles (DOT); the claimant can sustain concentration, attention, and pace sufficient enough to carry out those instructions over the course of an eight-hour workday and at two hour intervals; she can work in proximity to, but not in coordination with, co-workers and supervisors; the individual can have only superficial contact with the public; and the claimant can work in a low stress setting, which is specifically defined to mean no fast paced production, only simple work related decisions, and few or no changes in the work setting.

(Tr. 20.) At the fourth step, the ALJ determined that Plaintiff was unable to perform her past relevant work. (Tr. 27.) At step five, the ALJ determined that there were other jobs in the national economy that Plaintiff could perform. (Tr. 28.)

## IV. ISSUE AND ANALYSIS

Plaintiff raises three objections. Specifically, she contends that "[t]he ALJ [e]rred [i]n [f]inding [t]hat the [o]pinions of the [t]reating [p]sychiatrist and [p]sychologist [w]ere [i]nconsistent [w]ith the [m]edical [e]vidence." (Docket Entry 11 at 6.) Plaintiff further

3

contends that "[t]he ALJ [e]rred in [f]inding that [her] [a]ctivities [a]re [i]nconsistent with [w]ork-[p]reclusive [s]ymptoms." (*Id.* at 11.) Finally, Plaintiff contends that "[t]he Appeals Council [e]rred in [f]ailing to [c]onsider [n]ew and [m]aterial [e]vidence." (*Id.* at 3.) For the following reasons, none of these arguments warrants relief.[4]

### a. The ALJ adequately evaluated the medical opinions.

The longstanding requirements calling for adjudicators to weigh medical opinions and give special deference to treating source opinions have changed. *See* 20 C.F.R. § 416.920c(a) (effective March 27, 2017). Now, adjudicators "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources."[5] *Id.* Nevertheless, an ALJ must consider and articulate in the administrative decision how persuasive he or she finds each medical opinion or prior medical finding in a claimant's case record. *See id.* § 416.920c(b). When a medical source provides more than one opinion or finding, the ALJ will evaluate the persuasiveness of such opinions or findings as a class. *See id.* § 416.920c(b)(1). In doing so, the ALJ is "not required to articulate how [she] considered each medical opinion or prior administrative medical finding from one medical source individually." *Id.*

---

[4] In the interest of judicial economy, the Court has reordered Plaintiff's objections.

[5] The new regulations define a medical opinion as "a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions" in the ability to perform the physical, mental, or other demands of work activity or adapt to environmental conditions. 20 C.F.R. § 416.913(a)(2) (2017). The new regulations also define a "finding . . . about a medical issue made by . . . Federal and State agency medical and psychological consultants at a prior level of review" as a "[p]rior administrative medical finding." *Id.* § 416.913(a)(5).

4

In evaluating persuasiveness, the ALJ must articulate two factors: supportability and consistency. *Id.* § 416.920c(b)(2). Supportability is an internal check that references objective medical evidence and supporting explanations that come from the source itself. *Id.* § 416.920c(c)(1); *Revisions to Rules*, 82 Fed. Reg. at 5853. Consistency is an external check that references evidence from other medical and nonmedical sources. *Id.* § 416.920c(c)(2); *Revisions to Rules*, 82 Fed. Reg. at 5853. The ALJ must only address the three other persuasiveness factors—relationship with the claimant, specialization, and the catchall "other factors"—when two or more medical opinions, or prior administrative medical findings about the same issue, are equally persuasive in terms of supportability and consistency. *Id.* § 416.920c(b)(3), 416.920c(c)(3)-(5). Furthermore, "[s]tatements that [claimants] are or are not disabled, . . . able to work, or able to perform regular or continuing work," are statements on an issue reserved to the Commissioner. 20 C.F.R. § 416.920b(c)(3). Under the revised regulations, statements on issues reserved to the Commissioner are deemed evidence that "is inherently neither valuable nor persuasive to the issue of whether [a claimant is] disabled." 20 C.F.R. § 416.920b(c)(1)-(3). Additionally, the regulations make clear that, for such claims, "we will not provide any analysis about how we considered such evidence in our determination or decision." 20 C.F.R. § 416.920b(c).

### 1. Dr. Jennifer Kirby

Plaintiff first challenges the ALJ's assessment of the medical opinions of Dr. Jennifer Kirby. (Docket Entry 11 at 6-9.) In January of 2020, Dr. Kirby, a treating psychologist, provided an opinion by answering specific questions about Plaintiff's psychological

limitations. (Tr. 411, 438.) Dr. Kirby indicated that Plaintiff lacked the attention, energy, mood regulation, ability to think effectively, and ability to interact with others (including the ability to follow directions and accept criticism) necessary to maintain employment. (Tr. 411, 438.)

Dr. Kirby also addressed letters to the state agency in October 2019 and January 2019 recounting Plaintiff's course of treatment. (Tr. 310-11, 374-75.) Dr. Kirby indicated that Plaintiff had been assessed with major depressive disorder, recurrent, moderate; anxiety disorder with panic attacks; and ADHD. (Tr. 310, 374.) Dr. Kirby concluded that Plaintiff was unable to manage her emotions, concentrate, think effectively, or interact with others appropriately, which would be necessary to maintain employment. (Tr. 311, 375.)

The ALJ assessed Dr. Kirby's opinions as follows:

> Dr. Kirby concluded on October 27, 2019 that the claimant could not manage emotions, concentrate, interact with others, or think effectively to maintain employment. On January 24, 2020, Dr. Kirby concluded that the claimant was unable to maintain attention and concentration, follow and accept instructions, interact with others, leave the house, and process information to the degree required to work an eight-hour day (Ex. 2F; 6F; 8F; 13F). Dr. Kirby's findings are unpersuasive because they are inconsistent with the medical evidence, which shows that the claimant displayed a calm and cooperative behavior, normal speech, logical thought processes, normal thought content, no suicidal ideation, no auditory or visual hallucinations, intact cognition, intact judgment and insight (Ex. 5F/1-2; 9F). These findings and reported activities are inconsistent with an individual who is limited to the degree as determined by Dr. Kirby. Further, Dr. Kirby did not adequately cite to a significant amount of evidence on the record to support the findings and her conclusions are not supported by her own status exam findings. Accordingly, this opinion is unpersuasive.

(Tr. 25-26, 310-311, 374-75, 411, 438-440, 367-68, 412.)

The ALJ's assessment of Dr. Kirby's opinions was supported by substantial evidence. First, the ALJ pointed to Plaintiff's generally normal mental status reports, which showed a

6

calm and cooperative behavior, normal speech, linear thought processes, normal thought content, appropriate dress and grooming, no suicidal ideation, no hallucinations, intact cognition, and intact judgment and insight.[6] (Tr. 26, 367-71, 412.) Second, the ALJ pointed to Plaintiff's activities of daily living, which showed that she prepared meals, played computer games, interacted with others, painted, made shopping lists, did basic housework, cared for two cats, washed dishes, drove, could go out alone, shopped in stores and by computer, read, went on walks, interacted with others, and was good at following written instructions. (Tr. 26,

---

[6] (*See* Tr. 26, 412 (10/17/19 psychiatric progress report in which claimant was feeling "more depressed and anxious recently" in part due to back pain, was "very tearful," was appropriately dressed and groomed, had normal speech, was calm and cooperative, mood "not good," affect "mildly blunted," linear thought process, thought content devoid of dangerous and psychotic ideation, intact cognition, insight and judgment), 367 (7/25/2019 psychiatric progress note in which claimant was appropriately dressed and groomed, without dangerous ideation, demonstrating normal speech, calm and cooperative, mood "not great," affect "mildly blunted," through process linear, intact cognition, insight and judgment), 368 (10/17/18 psychiatric progress note in which claimant states she is "fine at this moment," that "she is not depending on Klonopin and is rarely using it," and that she is "making strides" in therapy, appropriately groomed and dressed, normal speech, calm and cooperative, "okay" mood "right now," normal affect, linear thought process, thought content without suicidal or homicidal ideation or hallucinations, and intact cognition, and fair insight and judgment); 369 (4/25/18 psychiatric progress noted in which claimant was "doing quite well," was rarely taking her Adderall in the morning because she did "not really need it much" then, was "very rarely" taking her Klonopin though it did help her "in her times of anxiety," was in the dialectical behavioral therapy "graduate group," was appropriately groomed and dressed, normal speech, calm and cooperative, "good" mood, "bright" affect, linear thought process, thought content without dangerous or psychotic ideation, and intact cognition, and intact insight and judgment), 370 (2/7/18 psychiatric progress note in which claimant "occasionally" took Klonopin, was "doing fairly well" though she felt "scattered at the end of the day," appropriately groomed and dressed, normal speech, calm and cooperative, "good" mood, "bright" affect, linear thought process, thought content devoid of dangerous or psychotic ideation, and intact cognition, and intact insight and judgment), 371 (11/8/17 psychiatric progress note in which claimant was "doing well," had graduated from dialectical behavioral therapy group into the graduate group, which was "good," was "feeling a lot better overall," asked for refill of a Klonopin prescription she had received "a couple of years" previously and that she had "finally used the bottle," was appropriately dressed and groomed, normal speech, calm and cooperative, good mood, "relatively bright" affect, linear thought process, though content devoid of dangerous and psychotic ideation, intact cognition, intact judgment and insight).

7

222-229, 42-62.) Third, the ALJ accurately pointed out that Dr. Kirby's opinions were not well-supported because she did not adequately cite to a significant amount of evidence on the record to support her findings and her conclusions were not supported by her own status exam findings. (Tr. 26, 411, 438.) Fourth, the ALJ also found the opinions of the non-examining state agency psychologists—neither of whom identified work preclusive limitations and both of whom considered one or more of Dr. Kirby's opinions—persuasive, because their opinions were consistent with the medical evidence, which they cited to in support of their opinions. (Tr. 26-27, 109-111, 127-129.) This was ample evidence supporting the ALJ's conclusion that Dr. Kirby's opinions were not persuasive.

### 2. Dr. Jennifer Siddle

Plaintiff next challenges the ALJ's assessment of the medical opinion of Dr. Jennifer Siddle. (Docket Entry 11 at 10-11.) In March of 2020, Dr. Siddle, Plaintiff's treating psychiatrist, also provided an opinion by answering specific questions about Plaintiff's psychological limitations. (Tr. 413-414.) The ALJ evaluated Dr. Siddle's opinion as follows:

> Jennifer Siddle[ ], M.D., completed a form on March 11, 2020, indicating that the claimant was unable to work full time and that she would have difficulties following instructions, concentrating, leaving her house, and interacting with others to be able to work a full workday (Ex. 10F). This opinion is not persuasive because it is inconsistent with the claimant's reported activities and the hearing testimony, which shows that the claimant prepared meals, played computer games, interacted with others, painted, made shopping lists, did basic housework, cared for two cats, washed dishes, drove, could go out alone, shopped in stores and by computer, read, went on walks, interacted with others, and was good at following written instructions (Ex. 5E). These reported activities are inconsistent with an individual who is limited to the degree as determined by Dr. Siddle[ ]. Further, Dr. Siddle[ ] did not cite to a significant amount of evidence on the record to support the findings and her mental status exam finding[s] do not support the severity of her conclusions. Therefore, this

opinion is not persuasive.

(Tr. 26, 413, 414, 222-229, 42-62.)

The ALJ's assessment of Dr. Siddle's opinion—which the ALJ accurately summarized—was supported by substantial evidence. First, the ALJ pointed to Plaintiff's mental status reports, which—as described in greater detail above—were generally normal. (Tr. 26, 367-71, 412.) Second, the ALJ also pointed to Plaintiff's activities of daily living, also discussed above and below, which were considerable. (Tr. 26, 222-229, 42-62.) Third, the ALJ accurately pointed out that Dr. Siddle's opinion was not well-supported because she did not adequately cite to a significant amount of evidence on the record to support the findings and her conclusions were not supported by her own status exam findings. (Tr. 26, 413-14, 367-71, 412.) In fact, the record contained only six medication-management and psychotherapy notes from Dr. Siddle. (Tr. 367-71, 412). Fourth, the ALJ also found the opinions of the non-examining state agency psychologists—neither of whom identified work preclusive limitations and both of whom considered Dr. Siddle's psychiatric progress notes—persuasive.[7] (Tr. 26-

---

[7] The Court does not agree with Plaintiff's contention that the ALJ "ignore[ed] critical parts of the medical evidence" and "cherry pick[ed]" evidence "in a way that distorts the record." (Docket Entry 11 at 6, 6-11 citing *Arakas*, 983 F.3d at 83 and *Lewis v. Berryhill*, 858 F.3d 858 (4th Cir. 2017).) An ALJ need not discuss every piece of evidence in making an RFC determination. *See Reid v. Commissioner of Soc. Sec.*, 769 F.3d 861, 865 (4th Cir. 2014) (citing *Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005)). Here, the ALJ repeatedly indicated that she considered all of the evidence (Tr. 17, 20, 22) and the Court is entitled to rely on these representations. *See Grubby v. Astrue*, No. 1:09CV364, 2010 WL 5553677, at *6 (W.D.N.C. Nov. 18, 2010) (citing *Rappaport v. Sullivan*, 942 F.2d 1320, 1323 (8th Cir. 1991)). The ALJ did not err here by focusing on the purported limitations ultimately identified by Drs. Kirby and Siddle, rather than each specific detail of Plaintiff's course of treatment as set forth in the narrative reports. To the extent, Plaintiff suggests otherwise, she is asking the Court to reweigh the record, which—as explained at the outset of this Recommendation—it is not permitted to do. As explained throughout this Recommendation, the record demonstrates Plaintiff's ability to perform a wide range of daily activities (Tr. 26, 222-29, 42-62); psychiatric records indicating that Plaintiff had

9

27, 109-111, 127-29.) This was ample evidence supporting the ALJ's conclusion that Dr. Siddle's opinion was not persuasive.

### B. The ALJ's subjective complaints analysis is well-supported.

Plaintiff also challenges the ALJ's assessment of her subjective symptoms, particularly as they relate to her activities of daily living. (Docket Entry 11 at 11-13.) A two-part test governs the evaluation of a claimant's statements about symptoms. "First, there must be objective medical evidence showing 'the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged.'" *Craig v. Chater*, 76 F.3d 585, 594 (4th Cir. 1996) (citing 20 C.F.R. §§ 416.929(b), 404.1529(b)).

If such an impairment exists, the second part of the test then requires an ALJ to consider all available evidence, including the claimant's statements about pain, in order to determine whether the claimant is disabled. *Id.* at 595-96. While the ALJ must consider a claimant's statements and other subjective evidence at step two, she need not credit them if they conflict with the objective medical evidence or if the underlying impairment could not reasonably be expected to cause the symptoms alleged. *Id.* Where the ALJ has considered the relevant factors, 20 C.F.R. § 416.929(c)(3), and heard the claimant's testimony and observed her demeanor, the ALJ's determination regarding Plaintiff's subjective complaints is entitled to deference. *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984).

---

generally normal mental status reports with appropriate dress and grooming (Tr. 26, 367-71, 412); and the opinions of the state agency psychological consultants who concluded that Plaintiff could perform a range of simple, unskilled work (Tr. 26-27, 109-111, 127-29).

10

Here, the ALJ completed the two-step *Craig* analysis. First, the ALJ stated that she had carefully considered the evidence and found that Plaintiff's "medically determinable impairments could reasonably be expected to cause some of the alleged symptoms." (Tr. 22.) The ALJ therefore discharged her duty under the first step of the *Craig* analysis. Second, at step-two of the *Craig* analysis, the ALJ decided that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence of record. Here, the claimant has described daily activities and exhibited behavior that is inconsistent with the claimant's allegations of disabling symptoms and limitations. Additionally, the objective medical records do not completely corroborate her statements and allegations regarding her impairments and resultant limitations." (*Id.*)

The ALJ then provided reasons, backed by substantial evidence, to credit Plaintiff's subjective claims less than fully. This included evidence of Plaintiff's ability to perform a wide range of daily activities (Tr. 26, 222-229, 42-62); psychiatric records indicating that Plaintiff had generally normal mental status reports (Tr. 26, 367-71, 412); and the opinions of the state agency psychological consultants that Plaintiff could perform a range of simple, unskilled work (Tr. 26-27, 109-111, 127-129). This is substantial evidence in support of the ALJ's assessment of Plaintiff's subjective complaints. It should also be remembered that the ALJ only partially discounted Plaintiff's testimony. The ALJ, in fact, acknowledged that Plaintiff had severe limitations and consequently limited her to a reduced range of light work with additional environmental, social, and cognitive restrictions in a low stress work setting. (Tr. 20.) Nevertheless, the jobs the ALJ concluded that Plaintiff could perform—laundry classifier,

11

garment sorter, and folder—accounted for Plaintiff's substantiated limitations. (Tr. 28.)

Plaintiff's arguments to the contrary are not persuasive. Plaintiff contends that the ALJ "mischaracterized" her activities of daily living and "failed to explain why they conflicted with her description of symptoms and the opinions of Dr. Siddle and Dr. Kirby." (Docket Entry 11 at 11.) In support, Plaintiff cites *Arakas v. Comm'r, Soc. Sec. Admin.*, 983 F.3d 83 (4th Cir. 2020) and *Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018), for the proposition that "the ALJ's descriptions of a claimant's activities must be accurate and take into account the claimant's qualifying statements about the extent and frequency of these activities. The ALJ must also explain why a particular activity reflects the ability to sustain full-time work." (Docket Entry 11 at 11.) Plaintiff specifically challenges as inconsistent with her testimony at the administrative hearing the ALJ's conclusion that during the relevant period she was able to care for her two cats, prepare meals, do basic housework, wash dishes, go out alone, drive, shop in stores, interact with others, and paint. (*Id.* at 12.)

The ALJ here did not materially overstate Plaintiff's daily activities and her daily activities evaluation is both adequate and susceptible to judicial review. The record contains varying statements from Plaintiff regarding her ability to engage in daily activities. For example, on January 10, 2019, Plaintiff completed a Function Report. (Tr. 222-229.) Plaintiff indicated that she had "two cats" and that she fed them, gave them water, and cleaned their litter boxes, and that no one else cared for them. (Tr. 223.) Plaintiff further indicated that she prepared meals daily for between a half an hour and an hour, including "a lot of pasta, rice, canned tuna, sandwiches, and bacon and eggs." (Tr. 224.) She also stated that she did housework in that she

12

did dishes every other day for an hour, but that she needed a reminder when "we are out of dishes." (*Id.*) Plaintiff indicated that she went alone once a week for "appointments," that she drove, and that she shopped one to two hours a week in stores, by mail, and by computer. (Tr. 225.) Plaintiff also noted that she interacted with others online daily and went once a week to individual therapy and twice a month to group therapy. (Tr. 226.)

At the hearing before the ALJ on May 6, 2020, Plaintiff testified that she had two cats (Tr. 42) who she cared for and played with on a typical day (Tr. 47). Plaintiff also testified that she cooked on a typical day, and further stated it was "very inconsistent," but then later stated that she cooked "[d]aily or every other day" by "heating things up" (Tr. 47-48) such as "bagged chicken or pizza or something fast" (Tr. 56). Plaintiff explained that her mother—with whom she lived—did not cook (Tr. 42, 56). Plaintiff also described going for walks as one of her "coping mechanisms." (Tr. 47.)

Plaintiff testified that before the pandemic she drove two or three times a week and that she generally went out to doctor's appointments, like seeing her therapist once a week or grocery shopping. (Tr. 43.) Plaintiff also testified that she grocery shopped "[m]aybe once a month or twice a month" and that "[o]nce [she] was out there [shopping she] wouldn't have difficulties." (Tr. 49.) She explained that she "would rather go shopping by [herself]" than with her mother (Tr. 55) and that when she went she was "very concentrated on what [she] needed to do and tried not to look around too much" because "[i]f [she] interacted with people it would stress [her] and [she] would try to hurry out" causing her to "forget things." (Tr. 55-56.) As a result, Plaintiff took lists "[a] lot of the time[ ]" when she shopped. (Tr. 56.) Plaintiff

13

explained that when she got home she was tired and so she would redirect her concentration by doing something else like putting the groceries away. (Tr. 56.) Plaintiff also explained that she had not been to the gym since before the outbreak of the pandemic. (Tr. 54.)

Plaintiff also testified that she did not like to leave the house because she did not want to encounter people she knew who might ask her personal questions. (Tr. 49-50.) She stated that she was unable to interact with more than a couple of people online and that she could become "derailed" if she got emotional. (Tr. 57-58.) She also stated that she was "trying to paint," but that it was "inconsistent." (Tr. 47-48.) She later testified that her painting was "going all right" but "very slowly" and that she had "one painting right now and [had] finished another" but that she got distracted by her cats, people on the internet, and "tweets." (Tr. 57.)

Plaintiff testified that her memory and concentration were "fine" unless she became emotionally upset. (Tr. 46.) When asked if she had friends, Plaintiff testified that she had "acquaintances," and that she did have one friend from college who "live[d] on the other side of the country" who she was "going to meet up [with] in November." (Tr. 48.)

Plaintiff also testified that on a "typical" day she would do "quite a bit" of "mostly solitary" video gaming and would also watch TV shows or Twitch, which she described as "a TV show that you can interact with basically." (Tr. 47.) Plaintiff testified that she had "chores" like doing the dishes, but that she did them inconsistently in that she could "do them for like three days in a row and then they'll pile up." (Tr. 62.) Plaintiff testified that she had "panic attacks" "at least twice a week" but that she did not know how long they lasted. (Tr. 59-60.) She also testified that twice a week it was "hard to get the motivation" to take a shower or to

14

get out of bed to get dressed. (Tr. 61-62.)

Given the differing statements from Plaintiff regarding both the type and the frequency of daily activities she could perform, the ALJ fulfilled her duty to weigh the conflicting evidence and determine which of Plaintiff's statements most harmonized with the record evidence. *See Craig*, 76 F.3d at 589 ("Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [ALJ]." (internal quotation marks omitted)). Furthermore, the ALJ's conclusion that during the relevant period Plaintiff remained able to prepare meals, play computer games, interact with others, paint,[8] make shopping lists, do basic housework, care for two cats, wash dishes, drive, go out alone, shop in stores and by computer, read, go on walks, interact with others, and follow written instructions (Tr. 26) constitutes a fair synthesis of the varying evidence on the subject. Under such circumstances, the Court should not "undertake to re-weigh [the] conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]," *Craig*, 76 F.3d at 589. Moreover, as the above-quoted language makes clear, the

---

[8] As the undersigned reads the record, the only activity that the ALJ may have plausibly overstated is painting. However, as demonstrated above, and by her own admission, Plaintiff did some painting. There is no reason to believe that a remand on the question of painting would yield a different result here and it would not be a good use of resources to send this matter back to the ALJ so that she could add the word "some" before paining in her decision. *See Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989) ("No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result."). Additionally, in her reply brief, Plaintiff emphasizes her testimony that she could not get out of bed one to two days a week other than to eat and take medication. (Docket Entry 14 at 7 citing Tr. 61-62.) However, as further demonstrated above, it is evident that the ALJ had good reasons for not finding this testimony entirely persuasive in light of the remainder of the record (including Plaintiff's other activities of daily living, her psychiatric progress reports, and the opinions of the non-examining state agency psychologists).

15

ALJ relied on more than Plaintiff's daily activities to find her statements not entirely consistent with the record evidence. The ALJ's assessment of Plaintiff's subjective symptoms is legally correct, well-supported, and susceptible to judicial review.

**C. Any error by the Appeal's Council was harmless.**

Finally, Plaintiff contends that the Appeals Council erred in failing to consider new and material evidence. (Docket Entry 11 at 3.) The Court may review the Commissioner's denial of benefits and remand pursuant to either sentence four or sentence six of 42 U.S.C. § 405(g). *See Shalala v. Schaefer*, 509 U.S. 292, 296 (1993). Under the former, the Court's review is limited to the pleadings and administrative record. *See* 42 U.S.C. § 405(g); *Wilkins v. Sec'y, Dep't of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991). Under the latter, the Court may remand a case "upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. § 405(g); *see also Schaefer*, 509 U.S. at 297 n.2 ("Sentence-six remands may be ordered . . . where new, material evidence is adduced that was for good cause not presented before the agency." (citations omitted)).[9]

Additionally, the Appeals Council must consider evidence submitted by a claimant with the request for review if the additional evidence is (1) new, (2) material, and (3) relates to the period on or before the date of the ALJ's decision. *Wilkins*, 953 F.2d at 95-96. Evidence is

---

[9] Plaintiff appears to be seeking a sentence four remand and so the Court will treat the issue accordingly. Nevertheless, the Court notes—in an abundance of caution—that the analysis and result below would essentially be the same even if Plaintiff sought a remand pursuant to sentence six.

16

new if it is not duplicative or cumulative. *Id.* at 96. Evidence is material if there is a reasonable probability—as opposed to the reasonable possibility required under the prior regulations— that the additional evidence would change the outcome of the decision.[10] 20 C.F.R. § 416.1470(a)(5) (2017). The new regulations applicable here also provide that the Appeals Council "will only consider additional evidence . . . if you show good cause" for not submitting it before the administrative hearing. 20 C.F.R. § 416.1470(b). The new regulations thus added two requirements for presenting new evidence for the first time at the Appeals Council level: (1) the claimant must show good cause for the failure to submit the evidence prior to the ALJ's decision; and (2) the claimant must show a reasonable probability of a different outcome.

Here, Plaintiff asserts that the Appeals Council erred by "simply ignor[ing]" evidence she submitted to it. (Docket Entry 11 at 4.) It does appear that Plaintiff's counsel faxed this evidence—a one-paragraph written statement by Dr. Siddle post-dating the ALJ's unfavorable decision and gathered at counsel's request—to the Appeals Council. (*Id.*, Exs. 1-3, Tr. 176-178.) Yet, it was not exhibited to, or acknowledged by, the Appeals Council's denial of Plaintiff's request for review, nor was it included in the administrative record. (Tr. 1-6.) It is thus unclear whether the Appeals Council looked at or assessed Dr. Siddle's post-decision

---

[10] Long-standing Fourth Circuit law defined "material" as a reasonable possibility the new evidence would have changed the outcome of the case. *See Meyer v. Astrue*, 662 F.3d 700, 705 (4th Cir. 2011). However, the new versions of Sections 404.970 and 416.1470 increase a claimant's burden from showing a reasonable possibility to a reasonable probability, and make the obligation to show a reasonable probability of a different outcome an additional requirement to showing materiality. The new version of the regulation applies here as it was effective January 17, 2017, with compliance by claimants required by May 1, 2017, *see Ensuring Program Uniformity at the Hearing and Appeals Council Levels of the Administrative Review Process*, 81 Fed. Reg. 90987-01, 90987, 2016 WL 7242991 (Dec. 16, 2016).

statement. The Court will therefore presume that the Appeals Council ignored Dr. Siddle's statement as Plaintiff alleges. Nevertheless, errors such as the one alleged here do not warrant a per se reversal.[11] Instead, the proper course is to consider whether the error was harmless.[12] For the following reasons, the Court concludes that if there was an error here, it was harmless.

### 1. Dr. Siddle's post-decision statement

After the ALJ issued her decision, Plaintiff's counsel submitted the following statement (an exchange between counsel and Dr. Siddle) to the Appeals Council:

> On March 11, 2020, you [Dr. Siddle] commented on [Plaintiff's] symptoms and limitations. Your comments are attached. You said:
>
>> She would not be able to sustain attention to simple tasks over the course of an 8-hour day on an ongoing basis. Her inattention and anxiety make sustained attention very difficult even when medicated. The rigid thinking of ASD [autism spectrum disorder] compounds inattention, making it simple for her to get "stuck" on unimportant details.

---

[11] Even under the older regulations, errors like the one alleged here were reviewed for harmless error. For example, in *Parker v. Colvin*, a remand was proper where the Appeals Council apparently never looked at post-decision evidence of a treating physician that had never been addressed by a factfinder. No. 1:11CV746, 2014 WL 4386291, *4 (M.D.N.C. Sept. 4, 2014). While this case is distinguishable from *Parker* both legally (the regulations are significantly different now) and factually (Dr. Siddle's earlier opinion was addressed by a factfinder), *Parker* still illustrates the larger principle that alleged omissions by the Appeals Council like this one are subject to harmless error review.

[12] *See, e.g., Smith v. Berryhill*, No. CV 1:18-337-CMC-SVH, 2019 WL 1549036, at *23-31 (D.S.C. Mar. 6, 2019) (finding Appeals Council's purported failure to assess in the first instance post-decision statement by psychologist harmless where the claimant failed to set forth good cause for not having submitted evidence sooner and where evidence was neither new nor material); *Markem v. Saul*, No. CV 2:18-00441-N, 2020 WL 1430474, at *9-10 (S.D. Ala. Mar. 23, 2020) (finding harmless Appeal's Council's purported oversight in failing to assess in the first instance post-decision evidence where claimant made no effort to establish good cause for not submitting it sooner and where the evidence was not materially likely to alter the outcome of the decision); *Parker v. Saul*, No. 4:20-CV-00211-CLM, 2021 WL 256635, at *5 (N.D. Ala. Jan. 26, 2021) (finding Appeals Council's purported failure to look at pain management records in the first instance harmless where those records did not appear to relate to the relevant period).

18

When corrected by a supervisor, [Plaintiff] will likely become very upset and fixated on her "error," making further work and correction difficult, if not impossible.

Yes, [Plaintiff has difficulty leaving her home]. Leaving home is very anxiety producing and stressful.

*In denying, [Plaintiff's] disability claim, the judge found that your conclusions above are inconsistent with the fact that your treatment notes show several normal findings on the mental status exams: calm and cooperative behavior, normal speech, logical thought processes, normal thought content, no suicidal ideation, no auditory or visual hallucinations, intact cognition, and intact judgment and insight. Please explain why these findings are not inconsistent with your conclusions above:*

In a psychiatric session, a patient is not challenged to perform as he/she would be in any work environment. Her behavior is cooperative in session, but often tearful 2° [secondary] to anxiety. Speech not of normal rate/tone/volume would be concerning for other diagnoses. Her thought process is logical but concrete (a characteristic of ASD), and while technically logical, is generally catastrophizing. Suicidal ideation and hallucinations would be grounds for hospitalization and also more suggestive of other diagnoses. "Cognition" merely implies grossly predicted IQ. That is, her presentation does not suggest intellectual disability formerly known as mental retardation. Judgement in her current setting (at home) is sufficient to perform [activities of daily living], but is strongly predicted to worsen significantly in a work setting, as evidenced by previous experiences.

(Docket 11, Ex. 1.)

## 2. Plaintiff failed to provide good cause for her untimely submission.

The first reason any error by the Appeal's Council here was harmless is because at no point has Plaintiff provided good cause for failing to submit Dr. Siddle's post-decision statement sooner. As alluded to earlier, under the new regulations, the Appeals Council is not authorized to even consider additional evidence absent a showing of good cause for why it was not submitted to the ALJ prior to the hearing. *Compare* 20 C.F.R. § 416.1470(b) (eff. to

19

Jan. 16, 2017) ("[I]f new and material evidence is submitted, the Appeals Council *shall consider the additional evidence only where it relates to the period* on or before the date of the [ALJ] hearing decision.") (emphasis added), *with* 20 C.F.R. § 416.1470(b) (eff. Jan. 17, 2017) ("[T]he Appeals Council *will only consider additional evidence . . . if you show good cause* for not informing us about or submitting the evidence as described in § 416.1435 . . . .") (emphasis added). Consequently, **<u>any failure by the Appeals Council to look at a statement it was prohibited from even considering was necessarily harmless</u>**.

More specifically, the 2017 amendment in § 416.1470(b) provides that

[I]n reviewing decisions based on an application for benefits, the Appeals Council *will only consider additional evidence* [that is new, material, which relates to relevant period, and which provides a reasonable probability of changing the outcome of the decision] if you show good cause for not informing us about or submitting the evidence [prior to the administrative hearing] because:

 (1)  Our action misled you;

 (2)  You had a physical, mental, educational, or linguistic limitation(s) that prevented you from informing us about or submitting the evidence earlier; or

 (3)  Some other unusual, unexpected, or unavoidable circumstance beyond your control prevented you from informing us about or submitting the evidence earlier. Examples include, but are not limited to:

   (i)  You were seriously ill, and your illness prevented you from contacting us in person, in writing, or through a friend, relative, or other person;

   (ii)  There was a death or serious illness in your immediate family;

   (iii)  Important records were destroyed or damaged by fire or other accidental cause;

   (iv)  You actively and diligently sought evidence from a source and the evidence was not received or was received less

> than 5 business days prior to the hearing; or
>
> (v)     You received a hearing level decision on the record and the Appeals Council reviewed your decision.

*See* 20 C.F.R. § 416.1470(b) (2017).

Here, Plaintiff has not provided good cause for failing to submit Dr. Siddle's statement to the ALJ prior to the administrative hearing. The explanation Plaintiff provides in her reply brief—that Dr. Siddle could not correct the ALJ's "misinterpretation" of the evidence prior to the issuance of the decision—does not provide good cause. (Docket Entry 14 at 3 ("Here, Dr. Siddle's second statement addressed the ALJ's misinterpretation of her treatment records and basic psychiatric principles. This could not have been anticipated, and the post-hearing submission of Dr. Siddle[ ]'s second statement was unavoidable.").) Plaintiff's counsel could have submitted **_any_** of the statements Dr. Siddle made in the post-decision submission block quoted above **_prior_** to the issuance of the ALJ's decision. Moreover, the fact that the ALJ concluded that Plaintiff's generally normal status reports did not support her allegations of total disability can hardly be called unusual, unexpected, or unanticipated. (Tr. 26, 367-71, 412.)

In fact, given that Dr. Siddle's post-decision statement is no more than a conclusory retrospective analysis of her own previously rendered opinions and medical records, nothing prevented Plaintiff's counsel from submitting it prior to the administrative hearing. *See, e.g.*, *Smith*, 2019 WL 1549036, at *27 ("Plaintiff's reliance on the fact that the statement was created after the ALJ's decision, without more, is not sufficient to overcome her responsibility to submit all evidence in support of her claim or inform the ALJ of outstanding evidence as

21

required to allow the ALJ's timely decision based upon a complete record.").[13] Were the Court to conclude otherwise, the good cause requirement would be rendered a nullity.

### 3. Dr. Siddle's post-decision statement is not new.

Likewise, as alluded to above, Dr. Siddle's post-decision statement is not new because evidence is new where it is not duplicative or cumulative. *See Wilkins*, 953 F.2d at 96. Here, the post-decision Siddle statement is not the result of ongoing treatment, a new evaluation, or provided as rebuttal evidence to new evidence that the ALJ introduced at or after the hearing. It is instead a conclusory attempt to clarify Dr. Siddle's prior opinions based upon prior treatment notes that were already provided in the record and assessed by the ALJ. In fact, the post-decision Siddle statement references evidence, and more generally repeats conclusions,

---

[13] The good cause requirement imposed in sentence six remand cases is similar to the amended regulation regarding sentence four remand and so cases dealing with requests for a sentence six remand are also instructive in this context. *See Smith*, 2019 WL 1549036, at *27 ("Although Plaintiff asserts the sentence six remand cases cited by the Commissioner are irrelevant because she is requesting a remand pursuant to sentence four, she fails to acknowledge the similarity of the good cause requirement now imposed under sentence six and the amended regulation."); *see also Culbreath v. Colvin*, 2016 WL 6780347, at *6 (W.D.N.C. Nov. 15, 2016) (explaining remand was not appropriate because the plaintiff failed to demonstrate good cause for not producing the "treating physician questionnaire" to the ALJ, noting the questionnaire was not organically produced by the doctor in the course of treatment and was not the product of any tests or treatments subsequent to the plaintiff's hearing, and finding the questionnaire "may be new in a technical sense of the word because the document was not in physical existence prior to [the ALJ's] decision, [but] nothing constrained [the plaintiff] from, prior to her hearing before [the ALJ], obtaining an affidavit from [the doctor] regarding his retrospective opinions about Plaintiff's symptoms"); *Overcash v. Astrue*, No. 5:07CV-123-RLV, 2011 WL 815789, at *5 (W.D.N.C. Feb. 28, 2011) ("To permit remand for evidence such as this would open the door to remand in any case where the plaintiff returns to a treating doctor to get a letter stating that the doctor disagrees with the ALJ's decision. Such a result is inconsistent with the good cause requirement's purpose of preventing these cases from going on indefinitely" and "there is nothing to indicate that [the doctor's] opinion was based on any medical evidence unavailable during the administrative proceedings below." (citations omitted).); *Mayes v. Massanari*, 276 F.3d 453, 462-63 (9th Cir. 2001) ("A claimant does not meet the good cause requirement by merely obtaining a more favorable report once his or her claim has been denied.").

that were already in the record and which had already been considered by the ALJ.[14]

For example, Dr. Siddle's March 11, 2020 medical source statement was part of the administrative record and was therefore considered by the ALJ. (Tr. 26, 413-14.) In it, Dr. Siddle opined that Plaintiff was unable to work full time and that she would have difficulties following instructions, concentrating, leaving her house, and interacting with others to be able to work a full workday (*Id.*) Likewise, the ALJ also had before her all of Dr. Siddle's treatment notes, including those reflecting Plaintiff's generally normal mental status reports. Dr. Siddle's post-decision statement is cumulative: it adds nothing new to the record beyond an effort to elaborate on her prior findings. (*Compare* Tr. 413-14 *with* Docket 11, Ex. 1.)

### 4. Dr. Siddle's post-decision statement is not material.

Beyond this, there is no reason—much less a reasonable probability—to conclude that a review of Dr. Siddle's post-judgment single-paragraph statement by the Appeals Council would change the outcome of the decision. As noted, the ALJ already considered Dr. Siddle's

---

[14] *See, e.g.*, *Smith*, 2019 WL 1549036, at *31 ("Dr. Jackson's statement simply reiterates his prior opinion, which the ALJ considered and accorded partial weight."); *Fagg v. Chater*, 106 F.3d 390 (4th Cir. 1997) ("Because Dr. Wootton failed to present any relevant evidence that the ALJ did not previously consider, we conclude that this evidence is cumulative and that Fagg has failed to demonstrate that it might reasonably have changed the decision of the ALJ in this case.") (quoting *Evangelista v. Secretary of Health & Human Servs.*, 826 F.2d 136, 140 (1st Cir. 1987) ("If a losing party could vault the 'newness' hurdle of § 405(g) merely by retaining an expert to reappraise the evidence and come up with a conclusion different from that reached by the hearing officer, then the criterion would be robbed of all meaning."); *Simila v. Astrue*, 573 F.3d 503, 522 (7th Cir. 2009) (stating "our prior decisions teach that the [ ] letter was hardly 'new' for § 405(g) purposes. Instead, the letter was merely 'derivative evidence,' because [the doctor] 'based his conclusions entirely on evidence that had long been available.' [The doctor] did not reexamine [the plaintiff] or conduct new psychological tests; rather he elaborated on his previous report and responded to [the plaintiff's] attorney's questions about the ALJ's concerns" and "Section 405(g) does not provide occasion for a physician to submit an unsolicited clarification of his prior opinion") (citations omitted).

23

treatment notes, as well as the March 11, 2020 opinion that Plaintiff was unable to work full time and that she would have difficulties following instructions, concentrating, leaving her house, and interacting with others to be able to work a full workday (Tr. 26, 413-14). In the decision, the ALJ explained that Dr. Siddle's opinion was not persuasive because it was inconsistent with Plaintiff's considerable daily activities, discussed in greater detail above. (Tr. 26, 222-229, 42-62.) The ALJ further explained that Dr. Siddle's March 2020 opinion was unpersuasive because Dr. Siddle did not adequately cite to a significant amount of evidence in the record to support her findings and her opinion was unsupported by the mental status examination findings. (Tr. 26, 367-71, 412.) The ALJ also pointed to the opinions of the non-examining state agency psychologists who concluded that Plaintiff could perform a range of simple, unskilled work. (Tr. 26-27, 109-111, 127-129.) Dr. Siddle's conclusory post-decision rebuttal statement does not undermine this substantial evidentiary basis, which amply supported the ALJ's non-disability finding. Any error by the Appeals Council was harmless.

## V. CONCLUSION

After a careful consideration of the evidence of record, the Court finds that the Commissioner's decision is susceptible to judicial review, legally correct, and supported by substantial evidence. Accordingly, this Court **RECOMMENDS** that Plaintiff's Motion for Judgment (Docket Entry 10) be **DENIED**, Defendant's Motion for Judgment (Docket Entry 12) be **GRANTED**, and the final decision of the Commissioner be upheld.

_____
Joe L. Webster
United States Magistrate Judge

January 11, 2022

24